E-FILED
Tuesday, 04 February, 2020 02:41:42 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

BETTY M.,
     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
     Defendant.

Case No. 1:19-cv-01023-JES-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 11), the Defendant's Motion for Summary Affirmance (Doc. 13), and the Plaintiff's Reply (Doc. 15). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted. [1]

**I**

Betty filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on March 18, 2013, alleging disability beginning on February 1, 2013. Her claims were denied initially on June 7, 2013 and upon reconsideration on October 17, 2013. Betty filed a request for hearing concerning her applications for DIB and SSI which was held before the Honorable John Wood (ALJ) on January 8, 2015. At that hearing, Betty was represented by an attorney, and Betty and a vocational expert (VE) testified. After the hearing,

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 7, 8) on the docket

1

Betty's claims were denied on June 15, 2015. Upon its requested review, the Appeals Council (AC) remanded the case in October 2016. A supplemental hearing was held on April 20, 2017 before the same ALJ at which time Betty was again represented by counsel and she and a VE testified. The ALJ again denied Betty's claims on February 15, 2018. Betty's request for review by the AC was denied on November 29, 2018, making the ALJ's February 2018 Decision the final decision of the Commissioner. Betty filed the instant civil action seeking review of the ALJ's Decision on January 18, 2019.

## II

At the first hearing in January 2015, Betty was fifty years old and lived alone in an upstairs apartment. She alleged in March 2013 the following conditions limited her ability to work: high blood pressure; anemia; Type 2 diabetes; a right torn rotator cuff; and migraines. AR 379.

Betty testified her last full-time job was in March 2013 in customer service for about one month. She said she did not currently work because she had diabetes episodes three days a week when she "sometimes" needed to take a "hour or so" to get herself together. AR 80. She said she had sharp pains three or four times per week which went down her legs and lasted for 20 to 30 minutes. Fluctuating blood sugar caused her episodes and caused her to lay down or eat something to get herself together. She identified Dominno Fogle, Physician Assistant-Certified (PA-C) as her general physician. She did not notice any change since she started taking insulin in November 2014.

Betty testified that her daughters lived in the same complex as she did, though one had only moved in recently whereas the other had lived in the complex four to five years. She explained when she needed assistance, she would call her daughter to stop by to assist with, for example, the can opener, laundry, and grocery shopping. Betty said she had days when her hands cramped up and she

2

was unable to put her "under clothes" on. AR 84. She did "[n]ot often" need her daughters' help with personal items because of her hands, just "when I have those days where I'm just too stiff or can't move" which she estimated to be once a month. AR 85. She said she had problems using her hands four to five days per week. The difficulty she had during those days depended upon what she was doing and she resolved it by waiting a couple of seconds and massaging her hands. She acknowledged she could do most of her apartment cleaning herself and she cooked. She took a break when doing the dishes if she needed to due to hand cramps. Betty also testified she did walking videos in the house to prevent stiffness and used rubber band exercises for her hands and shoulder that she learned at therapy. She did those exercises two to three days per week. She also walked around her complex twice per day for 10 to 20 minutes at a time.

Upon questioning by her attorney, Betty testified she had problems with her right shoulder which had previously undergone a surgical procedure in April 2013. That surgery was performed by a doctor willing to do it though Betty had no insurance and no income at the time. She confirmed she was right-handed. She continued to have spasms in her right shoulder and sharp pains such that she could not reach overhead and could not reach repeatedly. She used her left hand to get things above shoulder level. She used her left hand when repetitive reaching with her right hand caused problems. Betty stated she had numbness and tingling in her fingers in both hands. She said handling and gripping with her hands was "weak." AR 96. She said, "A lot of things I do with my left hand." AR 98. She did not fold her laundry because it was "kind of hard for [her] to do" and instead just placed it in the drawer. *Id*. She needed help with lifting heavy cases of water at the grocery store.

At the second hearing in April 2017, Betty had turned 53 and was still living by herself in her upstairs apartment. She continued to use the 13 to 15 steps up to

3

her apartment.  She said both of her daughters assisted her when she needed, such as when her trash bags were too heavy for her and they continued to help her when she grocery shopped.  She continued to use her rubber bands to stretch and continued to walk around her complex as much as she could, "probably" once or twice a day.  AR 43.

Betty testified that she thought she could not work because she had problems with her legs and her foot, weakness in her shoulders, tingling in her hands and fingers, and her hands cramped up.  Her diabetes became worse since the last hearing and her weight increased.  Upon questioning by her attorney, Betty described the pain in her legs, weakness in her right shoulder, tingling in her fingers, and pain in her back.  She limited her walking to 15 minutes.  She said she could stand "at least probably almost a hour if not a little bit more."  AR 49.  She said her medication made her "real sleepy" right after she took it.  AR 52.

The first hypothetical presented to the VE confined the individual to light work with limitations in standing and walking, some postural functions, no overhead reaching with the right upper extremity, occasional reaching with the right upper extremity, no pushing or pulling with that dominant upper extremity, other manipulative functions of that extremity done frequently, occasional pushing or pulling with the lower extremities, and limitations in environmental hazards.  The VE testified to available jobs for that hypothetical.  He also testified to available jobs for that hypothetical revised to include further environmental limitations and for an individual confined to sedentary work with the specified limitations.

### III

In his February 2018 Decision, the ALJ determined Betty had the following severe impairments:  diabetes; diabetic neuropathy; obesity; fibromyalgia; and

shoulder problems.  AR 17.  The ALJ made the following residual functional
capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) except she is unable to climb ladders,
> ropes, or scaffolds; she is limited to occasional kneeling, crouching,
> crawling, balancing, stooping, and climbing ramps or stairs; she must
> avoid hazards and concentrated exposure to temperature extremes,
> vibration, and loud noise; she is unable to perform overhead reaching
> with the dominant upper extremity; she is able to occasionally reach
> overhead with the nondominant upper extremity; she is unable to
> push or pull with the dominant upper extremity; she is able to
> perform other reaching tasks only occasionally with the dominant
> upper extremity; and, she is limited to frequent manipulative
> functions, such as handling, fingering, and feeling limited with the
> dominant upper extremity.

AR 20-21.

In his Decision, the ALJ cited Betty's July 2013 disability report in which she
reported she lived alone in an apartment and was able to attend to her own
personal needs and perform "normal household tasks," and he also cited Betty's
similar 2015 testimony and that she claimed she needed help from her daughter
about once per month.  AR 17.  He included Betty's testimony that she did leg and
hand exercises during the day and walked around her apartment complex for
exercise.  The ALJ summarized that during Betty's 2017 hearing, she confirmed
she continued to live independently and "perform a wide range of activities
during the day."  AR 18.

The ALJ also detailed that Betty had been treated since January 2009 at a
local family health clinic, she underwent rotator cuff repair surgery in April 2013
on her right dominant shoulder, she did physical therapy for her right shoulder,
and she continued to be followed for diabetes, peripheral neuropathy, and right
shoulder rotator cuff injury at the local family health clinic.  The ALJ discussed

that Betty's medication levels were adjusted, her pain was treated with various medications, she was started on insulin in addition to oral medications to control blood sugar levels, and she used support hose or stockings to treat lower extremity neuropathy. The ALJ noted that nerve conductions studies from January 2014 suggested generalized peripheral polyneuropathy associated with diabetes. He explained that after the initial hearing, the designated medical expert (ME), Eric Puestow, M.D., assessed Betty in July 2015 as generally capable of performing light duty work with limitations using her right upper extremity and with postural limitations.

The ALJ next explained ME Dr. Puestow evaluated Betty's complete medical history through September 18, 2017 after the supplemental hearing and verified she had severe diabetes, diabetic peripheral neuropathy, right shoulder rotator cuff tear and osteoarthritis, obesity, and fibromyalgia in addition to resolved anemia and left shoulder pain. The ALJ also acknowledged that since the prior decision was issued the medical evidence showed that Betty continued to be treated by physicians at the local clinic, including Artur Djagarian, M.D.

The ALJ noted Betty was diagnosed with fibromyalgia but the record did not indicate that she had signs or symptoms of the disorder that had required extensive treatment, that she was warned in June 2017 about her noncompliance with recommended treatment for diabetes, that she continued to experience right shoulder pain, and that she reported left shoulder pain though the record did not include radiographic imaging showing a left shoulder anatomical abnormality. The ALJ acknowledged Betty had difficulty using her upper extremities, "especially her right upper extremity . . . however, [she] is able to use her left upper extremity fairly well." AR 20. The ALJ further explained that Betty was obese given her recently measured height and weight.

6

Next, the ALJ determined Betty's impairments could be anticipated to produce a certain amount of pain and other potentially disabling symptoms, "but the record does not include objective medical evidence [sic] that are consistent with the allegation that the claimant is disabled." AR 21. The ALJ reasoned that while nerve conduction studies revealed peripheral neuropathy, the neuropathy was "not severe enough to require surgery or other invasive techniques." *Id.* Instead, Betty was treated for that disorder with exercise, wrist splints, and medication. The ALJ explained Betty experienced upper extremity pain, had limited range of shoulder motion, her recent examinations had not revealed significantly reduced joint motion, and peripheral neuropathy produced some sensation disruption. The ALJ continued to point out that the medical evidence of record did not demonstrate Betty had significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, or reflex abnormalities "associated with intense and disabling pain." AR 21.

The ALJ explained the "onset, nature, intensity, and duration of symptoms of her impairments, as well as precipitating and aggravating factors, have all been factored into the [RFC] assessment set forth herein." *Id.* The ALJ proceeded to highlight Betty's "conservative type care," her lack of disabling side effects from medication, and her activities of daily living (ADLs), as well as the fact that objective examining physicians, reviewing physicians, and the designated ME assessed her as generally capable of performing light or medium duty work. The ALJ concluded, "These other factors and the objective medical evidence all are inconsistent with her allegation of that [sic] she is unable to sustain substantial gainful activity; the claimant's allegation that she is disabled and unable to work cannot be fully accepted." *Id.*

Turning to the opinion evidence, the ALJ noted the state agency physicians' opinions that Betty was capable of a limited range of medium duty work (June

7

2013) and a limited range of light duty work (October 2013). The ALJ determined those assessments were of "limited probative value" because multiple medical documents had been added and Betty's testimony from both hearings had been received since those assessments were made. As for PA-C Fogle's February 2015 opinion that Betty was limited to occasional use of her hands for handling, fingering, and gripping and that she was unable to reach above the shoulder level with the right arm, the ALJ afforded it "some probative value" as it was "supported by objective medical evidence of record and [was] consistent with the opinions of the designated medical expert." AR 22. As for Dr. Djagarian, who the ALJ identified as Betty's attending primary care physician, the ALJ determined his opinion "cannot be afforded controlling weight." AR 23. Dr. Djagarian opined in May 2016 that Betty was limited from prolonged standing, reaching above the shoulder, sitting for more than two hours, and lifting more than 10 pounds. The ALJ commented that Dr. Djagarian's examination of Betty at the time he proffered his opinion revealed normal findings, mild tenderness on the side of the right shoulder with slightly reduced range of motion of the right shoulder joint, and no sensory deficits, among other things. The ALJ explained that Dr. Djagarian's opinion could also not be afforded significant probative value for much the same reasons. He elaborated that the opinion Betty was unable to lift more than 10 pounds or perform extended walking or standing as well as sitting was inconsistent with "treatment notes provided by Dr. Djagarian himself and are also inconsistent with the claimant's description of her activities and limitations." AR 23.

As for Dr. Puestow's September 2017 opinion that Betty would be limited to lifting 20 pounds or less, limited in her ability to fully use her right upper extremity as well as her left upper extremity to some degree, and limited in terms of

posturals, the ALJ afforded the opinion "significant probative value." *Id*. He afforded such weight because Dr. Puestow:

> cited test and examination results to support his opinion that the claimant did not have an impairment that meets or equals a listed impairment and is capable of performing a wide range of light duty work. The opinions provided by this objective medical expert are also consistent with other medical evidence of record and with the claimant's description of her limitations and activities.

*Id*.

## IV

Betty claims the ALJ: failed to properly assess Betty's symptoms; failed to properly weigh the treating physician opinion evidence; and the ALJ's functional capacity finding lacks substantial support.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled.

Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability.  *See* 20 C.F.R. § 404.1566[2].  The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980).  The factual determination is made by using a five-step test.  *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)   currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)   suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)   suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)   is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)   is unable to perform any other work existing in significant numbers in the national economy.

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same.  *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI).  Thus, the Court may at times only cite to the DIB regulations.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Betty claims error on the ALJ's part at Step Four.

### A

While Betty initially argues with regard to the ALJ's subjective symptom evaluation that the ALJ applied the wrong standard – whether her symptoms were "entirely consistent" with the record evidence – the Court sees no such flaw in the Decision beyond a poor choice of words amounting to "meaningless boilerplate." *Ronald B. v. Saul*, 18 C 5881, 2019 WL 3778070, at *5 (N.D. Ill. Aug. 12, 2019) ("Although the 'not entirely consistent' phrasing is meaningless boilerplate language that does not aid our review of the ALJ's subjective symptom evaluation . . . it does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies [his] subjective symptom assessment") (internal citations omitted). Betty argues the ALJ erred further by failing to set forth a legally insufficient symptom evaluation. The Commissioner counters that the ALJ properly assessed the extent to which Betty's subjective allegations were consistent with and supported by other record evidence, including the objective evidence.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p

provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

With regard to the ALJ's consideration of Betty's ADLs, Betty argues that ALJ did not explain why he perceived Betty's ADLs were inconsistent with her allegations and supported the ability to perform light work on a full-time continuous basis. She also argues the ALJ failed to properly take into account the limitations on these ADLs and Betty's difficulty in performing them. The ALJ considered the fact that she lived independently and was able to perform activities required to live by herself including preparing meals, attending to household tasks, driving, shopping, attending to financial affairs, and visiting with others. He reasoned that Betty was able to walk, stand, and sit while engaging in those activities while living independently in an apartment. The Court can trace the path of the ALJ's reasoning from the evidence of Betty's ADLs to his conclusion that the extent of such activity did not support the level of intensity, persistence, and limiting effects of impairments Betty alleged. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The Court can, in turn, trace the path of the ALJ's reasoning between his consideration of Betty's ADLs and his conclusion that Betty's ability to perform "her usual daily

12

activities" was inconsistent with her allegation of total and complete disability.
AR 21.

As for Betty's difficulty in performing some ADLs, it is true that an ALJ
"cannot disregard a claimant's limitations in performing household activities."
*Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Here, Betty testified that hand
problems came and went and depended upon what she was doing. She testified
that she needed help from her daughters because of her hands "[n]ot often." AR
85. When her hands stopped her from doing something, Betty would "wait a
couple of seconds and just kind of massage [her] hands." AR 87. She said someone
came over to help her with basic things like getting dressed "once a month." AR
88. Her daughters helped her with laundry and grocery shopping. At the
supplemental hearing, Betty testified that her daughters came over when she
needed assistance which she estimated to be two to three times a week. Betty
testified they helped with her household chores "if I need help" and she did her
own laundry "as much as I can. I just don't fold everything like I used to." AR 42.
In his Decision, the ALJ included Betty's testimony that she needed help from her
daughter about once per month, that she admitted doing her own cleaning and
cooking, and that she shopped with her daughters. AR 18. Though it was error
for the ALJ to omit the fuller extent of Betty's testimony as to the performance of
ADLs, the error was harmless as the ALJ did not place undue weight on Betty's
household activities. *See McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)
(explaining that administrative error may be harmless and thus a court ought not
remand a case to the ALJ where it is convinced that the ALJ would reach the same
result); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("We have cautioned
the Social Security Administration against placing undue weight on a claimant's
household activities in assessing the claimant's ability to hold a job outside the
home"). Beyond his reliance upon Betty's ADLs to support his subjective

symptom evaluation, the ALJ additionally cited to medical evidence that Betty did not have significantly limited range of motion, her peripheral neuropathy was treated with exercise, wrist splints, and medication, she did not have disabling side effects due to medication, and objective examination, reviewing physicians, and the designated ME assessed Betty as "generally capable of performing light or medium duty work." AR 21.

Betty also argues the ALJ provided no record basis that some other more aggressive treatment was appropriate, and she and the Commissioner argue whether diabetic neuropathy can even be treated surgically or invasively. Regardless of whether diabetic neuropathy can be so treated, the ALJ correctly observed the extent of Betty's treatment; her treatment included physical therapy, oral medication, insulin injections, exercise, and wrist splints. The ALJ made the observation that Betty did not require "more than conservative type care," and Betty does not point to anywhere in the record where doctors suggested more invasive treatment. AR 21. In response to that reality, Betty argues the ALJ legally erred where he made an adverse treatment inference without proper consideration of the reasons for perceived conservative treatment. Betty cites to select records dated in 2013 and one from early 2014 pertaining to her financial limitations with regard to medication and with regard to the shoulder surgery she eventually obtained as a "charity case." AR 1035. Betty does not cite to anywhere later in the record when she continued to mention her financial difficulty. She also does not cite to where doctors suggested additional treatment as time went on that Betty indicated she was unable to pursue. That notations such as those Betty cites appear in the record does not undermine that part of the ALJ's Decision that gave consideration to Betty's "conservative type care." AR 21. After all, the onus is not on the ALJ to question why treating doctors did not suggest more invasive treatment.

14

Betty's remaining arguments as to the ALJ's subjective symptom evaluation – that the ALJ legally erred by noting she lacked more marked objective clinical findings; that the ALJ cited no evidence that specific findings such as muscle atrophy, needed to be present for Betty to have pain; that the ALJ found Betty had fibromyalgia as a severe impairment which is not assessed by usual objective findings; and that he did not explain what disabling side effects Betty alleged - can be resolved in the same summary fashion that she presents them.  Objective evidence is to be considered in a subjective symptom evaluation, and so it was proper for the ALJ to rely, in part, on that evidence in rejecting Betty's allegations as to the extent of her symptoms.  The ALJ explained that the medical evidence did not demonstrate Betty had, among other things, muscle atrophy which was "associated with intense and disabling pain."  AR 21.  Dr. Djagarian's notes repeatedly included that Betty had normal muscle strength and tone.  The ALJ cannot be faulted for highlighting an absence of muscle atrophy in the medical evidence.  Betty's fibromyalgia argument is underdeveloped and thus requires no analysis.  Finally, Betty cites to just one page of the record wherein Dr. Djagarian noted her gabapentin had a lot of sedation in support of her contention that the ALJ did not explain what disabling effects she alleged.  An ALJ need not discuss every piece of record evidence.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion").  Also, Betty appears to believe that the sedation side effect of a claimant's prescribed medication automatically amounts to a "disabling" side effect.  She cites no authority for that belief.  The ALJ determined Betty did not have disabling side effects due to medication.  Beyond the record cited by Betty, at other times she complained of no medication side effects.  *See, e.g.,* AR 1222, 1258 (compliant with current treatment regimen), 1594, 1640 (pain symptoms subsided with medication), 1663, 1682.  The Court finds that

the ALJ's subjective symptom evaluation was not patently wrong. *See Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare it to be "patently wrong"); *see also Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (explaining the ALJ's credibility determination was not "patently wrong" because the ALJ found the claimant "not fully credible for may specific reasons supported by the evidence").

## B

Betty also argues that the ALJ improperly weighed treating Dr. Djagarian's opinion because he focused upon one examination rather than the entirety of supporting evidence, did not proffer a supportable rationale in several respects, and failed to properly set forth the weighing of his opinion under the regulatory factors. The Commissioner argues the ALJ reasonably concluded that Dr. Djagarian's opinion was not consistent with the record evidence such that it was not due controlling weight. The Commissioner further argues that the several bases upon which Betty argues error are contradicted by the ALJ's RFC finding and the discussion of the record evidence.

20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id*. An ALJ must give controlling

16

weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence."  20 C.F.R. § 404.1527(c)(2).[3]

An ALJ must provide some explanation for his decision to discount a treating physician's opinion, and as long as the ALJ has "minimally articulated [his] reasons for rejecting the treating doctor's opinion," the decision must stand. *Elder* 529 F.3d at 415.  Here, the ALJ considered Dr. Djagarian's May 2016 opinion and determined it was "not supported by medically acceptable clinical and laboratory diagnostic techniques" where examination at the time the doctor proffered his opinion showed, among other things, normal gait, no joint swelling, no joint tenderness, no scoliosis, normal motion of all joints, no joint instability, normal muscle strength and tone, mild tenderness on the side of the right shoulder, slightly reduced range of motion of the right shoulder joint, no sensory deficits, normal reflexes, no diabetic neuropathy noted, and good bilateral grip strength.  AR 22.  The ALJ determined that part of Dr. Djagarian's opinion that Betty could lift no more than 10 pounds or perform extended walking or standing as well as sitting was inconsistent with his own treatment notes and Betty's description of her activities and limitations.   The ALJ certainly "minimally articulated" his reasons for discounting the opinion and, in doing so, revealed that he considered the consistency and supportability of Dr. Djagarian's opinion with the record evidence.  *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (explaining though the ALJ did not explicitly weigh every factor while discussing her decision to reject the treating doctor's reports, it was enough that she discussed the supportability and consistency with the rest of the record of the doctor's

---

[3] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration.  However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

reports) (unpublished opinion) (citing *Elder*, 529 F.3d at 415-16) (affirming ALJ's denial of benefits where he discussed only two of the relevant factors of 20 C.F.R. § 404.1527).

True, the ALJ considered the supportability and consistency of Dr. Djagarian's May 2016 opinion with his treatment record from that particular date. True also is the fact that other records from Dr. Djagarian indicated that Betty upon examination at other times had reduced touch sensitivity of the fingers and of the toes and had reduced range of motion in both shoulders and reduced hip motion. In other words, Dr. Djagarian's treatment notes included a mixed bag of examination results. To reverse for the reason that the ALJ did not consider Dr. Djagarian's opinion in comparison to the entirety of the record evidence would be an overly technical application of 20 C.F.R. § 404.1527 in this case.

Missing from Betty's brief is the recognition that an ALJ's decision is to be read as a whole and with common sense. *See Rice v. Barnhart*, 384 F.3d 363, 369 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole . . . ."); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) ("we give the opinion a commonsensical reading rather than nitpicking at it"). Following his consideration of Dr. Djagarian's opinion, the ALJ considered the opinions provided by ME Dr. Puestow. The ALJ explicitly stated, "[Dr. Puestow] is a medical expert, designated by the Commissioner of the Social Security Administration to *resolve conflicts in the medical evidence* and provide objective opinions about a claimant's ability to perform work activities." AR 23 (emphasis added). The ALJ explained that Dr. Puestow "again evaluated the claimant's complete medical history through September 18, 2017" to render his opinion on that date. AR 23. Betty does not take issue with Dr. Puestow's opinion or otherwise argue that he failed to consider Dr. Djagarian's treatment records in formulating his opinion. The ALJ gave Dr. Puestow's assessments and opinions "significant probative value" where he cited

test and examination results to support his opinion and where his opinions were consistent with other medical evidence of record and with Betty's description of her limitations and activities. The ALJ did not reversibly err in his consideration of Dr. Djagarian's opinion where he availed himself of a ME to resolve conflicting medical records and clearly articulated his reasons for assigning more weight to the ME's opinion.

Betty's other arguments for why the ALJ improperly weighed Dr. Djagarian's opinion fare no better for the very reason that the Court must read the ALJ's Decision as a whole. On the one hand it is somewhat curious the ALJ chose to point out that upon examination Betty showed no cardiovascular abnormalities or edema. On the other hand, such results were just one example of many (themselves supported by the record) the ALJ listed to illustrate how Dr. Djagarian's May 2016 was not supported by medically acceptable clinical and laboratory diagnostic techniques on the very day he opined to Betty's limitations. As for Betty's argument that the ALJ failed to cite any treatment note from Dr. Djagarian which contradicted his opinion that Betty could not lift more than 10 pounds, her argument amounts to nothing more than nitpicking. The Court discussed *supra* that the ALJ's consideration of Betty's ADLs was not patently wrong, which obviates any necessity to consider Betty's argument that the ALJ improperly discounted Dr. Djagarian's opinion as inconsistent with Betty's activities. Lastly, as in *Hall v. Berryhill*, cited by Betty, the Court agrees that the ALJ inappropriately commented that Dr. Djagarian was a "sympathetic attending physician" without rooting that observation in specific record evidence. 906 F.3d 640, 643-44 (7th Cir. 2018). But just as the *Hall* court found, this Court finds that such a deficiency in the ALJ's reasoning does not undermine his broader conclusion that Dr. Djagarian's May 2016 opinion was neither entitled to controlling weight nor entitled to significant probative value. *Id*. at 644.

19

Ultimately, the ALJ's decision to discount Dr. Djagarian's opinion is legally sufficient and supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high").

## C

Betty lastly argues that the ALJ's RFC finding lacks substantial support because he simultaneously found the treating PA-C's opinion of limitation to occasional handling, fingering, and gripping was consistent and supported by record evidence and failed to include that limitation in the RFC. She also argues the ALJ failed to properly assess her morbid obesity and the combined impact of her impairments on her functioning. The Commissioner counters that the ALJ explained which evidence supported his determination that Betty could manage frequent manipulations with both hands and points out that the Seventh Circuit Court of Appeals has held that an ALJ can effectively account for a claimant's obesity by adopting the opinion of a physician who was aware of the obesity.[4]

Once again, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson*, 402 U.S. 389 at 390. The ALJ assessed treating PA-C Fogle's February 2015 opinion as entitled to "some probative value" where it was "supported by objective medical evidence of record and is consistent with the opinions of the designated medical expert." Elsewhere in the Decision, the ALJ noted that peripheral neuropathy produced

---

[4] The Court notes that the ALJ stated at the end of his RFC analysis, "Shoulder problems and neuropathy limit [Betty] to *occasional* handling, fingering, and feeling with the dominant upper extremity." AR 23 (emphasis added). Neither party mentions this fact in their brief and it appears they both treated use of the word "occasional" in that sentence as a typographical error. That it was a typographical error is supported by the record where the RFC finding appearing in bold at AR 20-21 of the ALJ's Decision included "frequent" manipulative functioning with the dominant upper extremity, the hypothetical question presented to the VE in April 2017 included a limitation to "frequent" handling, fingering, and feeling in the dominant upper extremity by the individual, and the ALJ reiterated later in that hearing handling, fingering, and feeling were "frequent" with the dominant upper extremity. *See* AR 21, 54, 66.

"some sensation disruption," medical evidence did not demonstrate "significantly limited range of motion," Betty was able to perform the activities required to live by herself, she had good bilateral grip strength, her peripheral neuropathy of both upper extremities had not resulted in persistent and significant disorganization of motor function, and examination in May 2016 showed no sensory deficits and no diabetic neuropathy was noted. ME Dr. Puestow's opinion provided Betty was "limited in her ability to fully use her right upper extremity as well as her left upper extremity, to some degree." AR 23. Clearly, the ALJ credited Fogle's opinion with "some probative value" because the fact of Betty's limitation in the use of her upper extremities found support in the record. Whereas the ALJ afforded "some probative value" to Fogle's opinion in light of such record evidence, she afforded "*significant* probative value" to Dr. Puestow's opinion which provided that Betty could use her right and left hands continuously for handling, fingering, and feeling. The *greater* probative value given to Dr. Puestow's opinion is reflected in the ALJ's RFC finding limiting Betty to greater use (frequent) of her dominant upper extremity than the use to which Fogle opined.

As for Betty's obesity, the ALJ expressly pointed out Betty's BMI was "recently" measured by her physician to be 36.64 and that she was obese. ME Dr. Puestow's opinion identified obesity as one of Betty's impairments and noted her BMI to be "35-37." AR 1716. The Seventh Circuit explained in *Prochaska v. Barnhart* that any error on the ALJ's part in that case to explicitly address the claimant's obesity was harmless where he "specifically predicated his decision upon the opinions of physicians who did discuss her weight" and where the claimant "failed to specify how [her] obesity further impaired [her] ability to work." 454 F.3d 731, 737 (7th Cir. 2006) (citing *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004)). In this case, the ALJ obviously predicated his RFC finding on ME Dr. Puestow's

opinion where he gave that opinion "significant probative value." The Court also notes that treating Dr. Djagarian's May 2016 treatment note, which the ALJ expressly considered, included a notation that Betty was obese. *See* AR 1281 ("BMI 35.51"). It was Dr. Djagarian's March 2017 treatment note to which the ALJ cited when pointing out Betty's "recently measured" BMI was 36.64. AR 1255. Betty does not specify how her obesity further impaired her ability to work beyond arguing that the ALJ "failed to analyze that [her] sitting difficulty *could be* exacerbated by her obesity." Plf's MSJ (Doc. 12 at pg. 17) (emphasis added). As in *Prochaska*, "because the record relied upon by the ALJ sufficiently analyzes [Betty's] obesity, any error on the ALJ's part is harmless." 454 F.3d at 737. Betty's argument in reply – that the ALJ did not adopt ME Dr. Puestow's opinion – is unconvincing. That the ALJ did not adopt Dr. Puestow's opinion verbatim is of no moment; the final determination of RFC is an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner"). Remand is not warranted in this case.

### V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 11) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 13) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew M. Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Betty M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C.

§ 636(b)(1).  Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on February 4, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE